No. 80-285

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

JERRY PAUL FORSYTH,

Defendant and Appellant.

---

Appeal from: District Court of the Eleventh Judicial District,
In and for the County of Flathead
Honorable Robert C. Sykes, Judge presiding.

Counsel of Record:

For Appellant:

Keller and Gilmer, Kalispell, Montana
Robert Keller argued, Kalispell, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Chris Tweeten argued, Assistant Attorney General,
Helena, Montana
Ted O. Lympus argued, County Attorney, Kalispell, Montana

---

Submitted: October 21, 1981

Decided: March 19, 1982

Filed: MAR 19 1982

Thomas K. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Jerry Paul Forsyth appeals from a judgment of conviction of deliberate homicide of his wife, Karen Forsyth, following a jury trial in the District Court, Eleventh Judicial District, Flathead County. Forsyth received a sentence of imprisonment of 70 years and was designated a dangerous offender.

In this bizarre case, officers of the Kalispell police department investigated a shooting report at the Skyline Bowl in Kalispell about 2:30 a.m. on December 12, 1979. The investigating officers were met at the front door of the bowling alley by Douglas Richards. Inside, the officers found Jerry Paul Forsyth apparently semi-conscious, lying on the floor. Douglas Richards brought the attention of the officers to the counter of the bowling alley, where they found the body of defendant's wife, Karen Forsyth, dead of a single gunshot wound to the head. A hand pistol, which had not been fired, was lying near the victim's feet.

Richards and Forsyth were placed in separate squad cars. The officers searched the building and found that no one else was present. Forsyth was taken to a hospital complaining of a head injury. He was found to be suffering from a superficial bruise and laceration on the back of his head but exhibited no serious symptoms.

The next morning two officers questioned Jerry Paul Forsyth about the shooting incident. He stated that he and his wife were closing the bowling alley for the night. As he started to lock the front door, the door was jerked from his hand from the outside. He turned to warn his wife and was struck from behind and knocked unconscious. He testified to the same story at trial.

Douglas Richards had been questioned in the squad car at the scene of the crime. He stated that he had been in

the basement of the bowling alley and had heard a "popping" sound which he thought to be a boiler noise.  Later, when he came upstairs, he found Karen Forsyth dead and the defendant, Jerry Paul Forsyth unconscious.  Richards then called the police.

On January 25, 1980, Douglas Richards was arrested on a charge of sexual intercourse without consent involving a girl under the age of 16.  Following his arrest, he was further interrogated regarding the murder of Karen Forsyth.  When Richards was granted immunity in exchange for his cooperation respecting Karen's death, Richards recanted his prior story and implicated the defendant Jerry Paul Forsyth in the murder of Karen Forsyth.

At the trial of Forsyth, Richards testified under a grant of immunity from prosecution for the Forsyth murder, the statutory rape charge for which he had been arrested, and an additional charge of possession of dangerous drugs.  In his testimony he stated that he had begun working for the defendant Jerry Paul Forsyth at Skyline Bowl in the summer of 1979 and that he and Forsyth had become well acquainted.  Forsyth complained to Richards that he no longer loved his wife Karen, but could not seek a divorce because an interest in the bowling alley was in her name.  Forsyth was having an affair with a woman named Debby Neff, and he wanted to move in with her by Christmas. Because of his wife's interest in the family property, Forsyth told Richards that he wanted to kill his wife and asked for advice on how to do it.  Richards, who appears to have been a most obliging person in these respects, suggested several ways, including the staging of a robbery.  The discussions on ways to kill Karen Forsyth extended over several months.  According to Richards, he

told the defendant it would take $40,000 to $50,000 for Richards to kill her himself. In late November, they decided to try an overdose of barbiturates on Karen Forsyth. Richards purchased the drugs, Seconal and phenobarbitol, from a pharmacist, using money furnished by the defendant. Forsyth later told Richards that the attempt failed because the drugs were not powerful enough.

Thereupon Richards suggested setting up a fake robbery in which Karen Forsyth would be killed. Forsyth procured a .22 caliber snub-nosed revolver. Forsyth and Richards chose a locker in the bowling alley basement locker room in which to hide the gun and the expected fruits of the robbery. For this purpose, Forsyth filled out the locker key envelope for locker no. 191 in the name of Greg Phillips, a bowler who had bowled on a team at Skyline Bowl. Richards placed a bowling bag and a pair of bowling shoes in the locker in order to avoid suspicion. On December 9, 1979, he placed the gun in the locker. When Richards arrived at work the next night, December 10, the defendant told him the crime would be committed that night. Richards took the gun from the locker, wrapped it in a rag, and gave it to Forsyth. Richards was an alcoholic and he drank steadily throughout the night from a bottle hidden in the basement area of the bowling alley. Although the bowling alley usually closed earlier, Forsyth had been remaining until the adjoining bar closed at 2:00 a.m. for several days, purportedly to stop vandalism of bowling alley equipment. This routine served as a pretext to get Karen Forsyth to remain in the bowling alley so the "robbery" could take place. On the fateful night, the bartenders and last patrons left several minutes after 2:00 a.m. Richards and Forsyth stood at the front window watching them

-4-

leave.  Richards' girlfriend made a brief appearance about this time.  Richards gave her a key and told her to wait for him at his apartment.  Richards then went to the basement locker room, opened the locker and prepared it to receive the proceeds of the "robbery" and the gun.  He returned to the upstairs area, set several alarm trip-wires, and turned off the lights.  He went downstairs to hide his bottle and get his coat.  He then heard a single gunshot and returned upstairs to the bowling alley where he found the defendant putting the gun down and removing his gloves.  Karen Forsyth had fallen to a position leaning against the counter near the cash register.

They waited until her body showed no signs of life.  As part of the "robbery," Forsyth inserted a pencil into the barrel of a .9 millimeter pistol and, holding the pistol by the pencil, got Karen Forsyth's fingerprints on the pistol and placed it near body.  Richards donned the pair of gloves, took the pistol that Forsyth had used to kill Karen Forsyth and struck Forsyth in the back of the head.  Richards pushed Forsyth to the floor and then collected the money from the counter to complete the "robbery."  He took the money, the gloves, and the gun downstairs, and locked them in locker no. 191.  Thereupon he called the telephone operator to report the "robbery" to the police.

There are additional facts which we will discuss later in this opinion in connection with the issue of corroboration of an accomplice.

The jury returned a verdict of guilty and the District Court imposed the judgment and sentence from which this appeal arises.

There is an overriding issue on which we must reverse the judgment and remand this cause to the District Court for

-5-

a new trial. That issue involves the failure of the District Court, probably accidental, to define the elements of the crime of deliberate homicide in the instructions given to the jury.

The State concedes error in that the jury was not instructed as to the statutory elements of the crime. It also concedes that under State v. Lundblade (1981), ___ Mont. ___, 625 P.2d 545, 38 St.Rep. 441, it is clear that the trial court is obligated to give such an instruction even if one is not offered by the defense. The State, however, asks us to overlook the instructional error on the ground that it was harmless.

The State contends that in this case both sides proceeded on the premise that a deliberate homicide had been committed, and that the essential fact question for the jury to decide was the identity of the killer. All the jury had to decide, contends the State, is whether the crime was committed by the defendant as the State's evidence showed, or by an unknown assailant.

Lundblade stands for the proposition that "at a minimum" the District Court must explain or define the crime for the jury. Lundblade, 625 P.2d at 548, 38 St.Rep. at 443. See State v. Campbell (1972), 160 Mont. 111, 114, 500 P.2d 801, 803. We must agree with the rationale of the court in Williams v. United States (1942), 131 F.2d 21, 22, where the court said: "The average man has some idea of what murder is, but we would not expect a judge to say, Jurors, you know what murder is, go and decide if this man is guilty of it." In view of the fact that every material fact necessary to constitute a crime must be proved beyond a reasonable doubt, we cannot ascribe the failure to define the elements

-6-

of the crime to the jury as harmless error.

Accordingly, our disposition of this case turns upon the same point as the disposition by us in Lundblade. We reverse the conviction and remand the cause for a new trial. We decline to reverse and dismiss, however, because there is evidence in the record to support the conviction. Lundblade, supra, 625 P.2d at 549 and cases thereunder.

Because this case must be retried, we will discuss other issues raised by the appellant Forsyth for the purpose of guidance to the trial court.

Forsyth contends that there was insufficient corroborative evidence in this case to support the testimony of Douglas Richards, who except for the immunity given to him, was otherwise accountable for this crime.

In State v. Kemp (1979), ___ Mont. ___, 597 P.2d 96, 36 St.Rep. 1215, we discussed the sufficiency of evidence necessary to corroborate accomplice testimony. First of all, the sufficiency of such evidence is a question of law. Kemp, 597 P.2d at 99 and cases cited thereunder. To be sufficient, it must show more than that a crime was in fact committed or the circumstances of its commission. It must raise more than the suspicion of the defendant's involvement or opportunity to commit the crime charged. But the evidence need not be sufficient by itself to support the defendant's conviction or even to make out a prima facie case against him. It may be circumstantial and can come from the defendant or his witnesses. Kemp, 597 P.2d at 99. Under section 46-16-213, MCA, it must be evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense.

-7-

Keeping in mind these principles, we examine the corroborative evidence that supports Douglas Richards' testimony.

The Gun

Richards testified that, after the killing, he placed the gun in locker no. 191 in the basement of the bowling alley along with the money and gloves that had been used. He testified that he burned the gloves in the boiler firebox, and melted the gun down with an arc-welder kept in the bowling alley for equipment repairs. The melting of the gun generated smoke which was noticeable to bowling alley patrons. Witness Lynn Norby went bowling at the Skyline Bowl on January 5, 1980. While there, she said she saw the bowling alley fill with smoke down on the lanes. She went to the desk where Forsyth was standing because she thought the place was on fire and talked to him. He reassured her, telling her to go ahead and bowl because they were doing some welding downstairs.

The Money

Richards had testified that the money taken in the "robbery" had been deposited by him in locker no. 191. He testified that ten days later he removed the money from the locker and hid it in two other places in the basement, behind a floor joist, and in an oil reservoir behind the pin polishing machine. He spent the large denomination bills, which had been hidden behind the floor joist, drinking and gambling. The group of one dollar bills which had been hidden in the oil reservoir became saturated with oil. Richards testified that he gave these bills to Forsyth, who told Richards that to avoid suspicion, he would send them to the bank with the bowling alley receipts with a

cover story that his partner Jon Ball had spilled furniture polish on them. Witness Jon Ball testified that he remembered the one dollar bills which were oily, and that Forsyth had told him that furniture polish had been spilled on them.

Defendant's Statements

When Richards was arrested on the statutory rape charge, his first call was to Forsyth. Forsyth went to a Kalispell attorney for the purpose of learning what to do about bailing Richards out. Richards testified that when Forsyth failed to bail him out in accordance with their previous agreement, he decided to tell the truth about Karen Forsyth's murder and make the best deal he could for himself. Both parents of Douglas Richards testified regarding statements made by defendant the morning following Richards' arrest. William Richards testified that he received a telephone call from Debby Neff, the defendant's girlfriend, asking if Forsyth could come to talk to them. When he arrived, Forsyth told the Richards' that Douglas Richards had been arrested for statutory rape and that Forsyth could provide $1,000 of the $2,500 necessary for bail. Forsyth then said, "If Doug talks, we will both be in a lot more trouble than he is in now." Doris Richards testified essentially the same but in more detail. She stated that Forsyth was very nervous and very concerned about getting Douglas out when he arrived that morning. She testified that the defendant kept saying, "We have got to get him out of there, we have got to get him out of there because if he talks we are both going to be in a lot more trouble than he is in now." Doris Richards also testified that Forsyth stated, "I wish Doug when he gets out he would get completely out of the country."

There was other evidence. A handwriting expert testified that the printed name of Greg Phillips on the locker envelope,

-9-

when compared to an exemplar taken from Forsyth, could have been that of Forsyth. Also Forsyth had a poor relationship with his wife. She was 5'4 1/2" tall and weighed 280 pounds. She had been emotionally disturbed and suicidal over a period of years prior to her death. She was hostile to Debby Neff and had threatened her and her children. Witness Gary Red Elk testified that Forsyth once told him with respect to Karen's suicide attempts: "If she's going to do it I wish she would do it and get it over with." Forsyth also told Red Elk that divorce was not acceptable because of Karen's interest in the house, the bowling alley, and several valuable purebred show dogs that they owned.

On the morning of the killing, the officers requested of Forsyth his consent to search the bowling alley. Forsyth gave consent on the condition the officers not search the locker area where, according to Richards, the evidence of the murder was hidden. Also on the morning following the killing, the investigating officer began to suspect the defendant because he seemed emotionally unaffected by his wife's death.

In sum, and taken individually, these items of evidence tend to connect Forsyth with the crime, and to corroborate the testimony of Richards. Forsyth quarrels on appeal with the effect of this evidence, and particularly with the statements related by the parents of Douglas Richards. However, his quarrel goes to the weight of the evidence and not to its admissibility.

Forsyth also contends that the court erred in its instruction to the jury on the credibility of an immunized witness.

-10-

The court instructed the jury with respect to the testimony of Richards as follows:

"The testimony of Douglas M. Richards ought to be viewed with distrust because he is an accomplice and in weighing his testimony, you are to further consider that he has been granted immunity from prosecution."

The court refused Forsyth's offered instruction which would have told the jury:

"The testimony of Douglas M. Richards ought to be viewed with distrust, and because he has given evidence in exchange for immunity from prosecution, evidence given by him and other evidence based upon his testimony is particularly suspect."

The last portion of Forsyth's offered instruction is taken from language found in our opinion of State v. Kemp, supra, 597 P.2d at 98.

Under section 46-16-201, MCA, the rules of evidence in civil actions are applicable to criminal actions, unless otherwise provided in the criminal code. Under section 26-1-303, MCA, relating to instructions to the jury on how to evaluate evidence, it is required that the jury be instructed by the court on all proper occasions "that the testimony of an accomplice ought to be viewed with distrust."

We find no error in the instruction given by the court, which is not substantially different from that proposed by Forsyth, although counsel contends there is substantial difference. The statutory obligation of the District Court in this cause was to inform the jury that Richards' testimony ought to be viewed with distrust. A simple statement to that effect would probably best serve the statutory requirement. In retrial, we would suggest the simple instruction that "the testimony of a person accountable for the same crime ought to be viewed with distrust." Any further embellishment may tend to lead to confusion and obfuscation.

-11-

Forsyth also contended that the testimony of the handwriting expert Jan Beck should be stricken from the record because his procedures in examining the envelope were impermissibly suggestive. We regard the objections made by Forsyth as merely going to the weight of the testimony, however, and see no need to exclude that evidence in any further trial.

Forsyth's counsel also contends he was not given enough time to argue his case to the jury at the conclusion of the case. This can be avoided in a future trial by an express agreement arrived at between counsel and the court before the argument begins as to the amount of time allotted for making oral argument.

Since we are remanding for a new trial, the other issues raised by Forsyth are not germane for discussion.

In accordance with this opinion, therefore, the judgment of conviction for deliberate homicide against the defendant is vacated, and this cause is remanded to the District Court for a new trial.

```
                                    John C. Sheehy
                                    ────────────────────
                                         Justice
```

We Concur:

```
Frank I. Haswell
────────────────────
   Chief Justice


────────────────────


────────────────────
        Justices
```

Mr. Justice Daniel J. Shea will file a written dissent at a later time.

-12-

No. 80-285

STATE OF MONTANA,

          Plaintiff and Respondent,

     vs.

JERRY PAUL FORSYTH,

          Defendant and Appellant.

--------------------

D I S S E N T
--------------------

Mr. Justice Daniel J. Shea

                              Dated:
                              March 29, 1982


FILED

MAR 29 1982

Thomas J. Kearney
CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

I do not believe the accomplice testimony was sufficiently corroborated as a matter of law, and therefore, I would reverse and order the case dismissed. The so-called corroborating evidence in this case falls far short of what the California court has declared to be insufficient as a matter of law. See People v. D'Allesandro (1958), 163 Cal.App.2d 559, 329 P.2d 616.

On the other hand, I disagree with the majority that the defendant is entitled to a new trial solely because the jury was not instructed on the elements of deliberate homicide. The elements of this offense were not at issue in this case, and the failure to instruct the jury on them was therefore harmless error.

To prove deliberate homicide the State must prove that the person charged "purposely or knowingly" killed another. The issue in this case was not whether the defendant "purposely or knowingly" killed his wife, and the issue was not whether the defendant had legal excuse or justification to kill his wife. The evidence was uncontroverted that someone "purposely or knowingly" and without excuse or justification, killed Karen Forsyth. The question at trial was whether this defendant was in any way involved with that killing. The accomplice testified that he and the defendant planned the murder and that defendant actually fired the fatal shot. The defendant, on the other hand, testified that he and his wife were closing the bowling alley for the night. As he started to lock the front door, the door was jerked from his hand. He turned to warn his wife, was struck from behind, and knocked unconscious. And, of course, he denied that he and Douglas Richards had planned a murder.

-13-

At the conclusion of the trial, an instruction setting forth the elements of deliberate homicide was accepted by the trial court, but somehow this instruction was lost in the paper shuffle and it was not given to the jury. The defendant at no time brought this to the trial court's attention, and both the State and the defendant argued the case to the jury without any need to refer to the elements of deliberate homicide, for the elements of the crime were not at issue. The issue was simply whether defendant killed his wife.

Several jury instructions were given on the charge of deliberate homicide, although none of them set forth the elements. Instruction no. 8 stated that the defendant was accused of deliberate homicide and that the State must prove every material fact. Instruction no. 9 stated that the State must prove that each element of the offense was done purposely or knowingly. Instruction no. 10 told the jury that a material element of the offense is a voluntary act--that is, the act of killing must have been voluntary. The term "voluntary act" was defined for the jury. Further, this case was certainly not defended on the ground that the killing was either an accident or that the defendant somehow did not have the state of mind to commit the offense. Instruction no. 11 told the jury how the terms "purposely or knowingly" are proved:

> "Purpose and knowledge are manifested by the cir-
> cumstances connected with the offense. Purpose
> and knowledge need not be proved by direct evidence,
> but may be inferred from acts, conduct and circum-
> stances appearing in the evidence."

This Court has long adhered to the rule that it will not review a case for a new trial where the trial court failed to instruct the jury on a matter of law unless that failure is prejudicial to substantial rights of the appellant. Section

-14-

46-20-702, MCA; State v. Heiser (1965), 146 Mont. 413, 419, 407 P.2d 370, 373; State v. Bubnash (1963), 142 Mont. 377, 393, 382 P.2d 830, 838. See also McGuinn v. Crist (9th Cir. 1981), 657 F.2d 1107. In McGuinn the defense was alibi, and the defendant asserted that because the trial court gave the jury the impermissible Sandstrom instruction (declared unconstitutional in Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39), he was entitled to a new trial. That instruction stated that "the law presumes that a person intends the ordinary consequences of his voluntary acts." The Ninth Circuit, however, held this instruction to be harmless error because it could not have had an effect on the jury's decision. The victim had been shot four times in the head and had been very obviously murdered. The Court concluded that a reasonable juror could not have found beyond a reasonable doubt from the evidence that the defendant voluntarily committed the acts causing the victim's death without also inferring beyond a reasonable doubt that he also committed these acts knowingly or purposely. The same thing occurred here; the only question at trial was whether Jerry Forsyth killed his wife. An instruction setting forth the elements of deliberate homicide would not have affected a reasonable juror's deliberations.

Although I have always been a stickler for proper jury instructions, I fail to see a basis for reversal on this ground where the only issue before the jury was whether the defendant participated in killing his wife. The defendant wanted the jury to believe that someone came into the bowling alley and knocked him unconscious and then murdered his wife. Douglas Richards had a different story, and the jury chose to believe it. Under these circumstances, the failure to instruct the jury on the essential elements of the crime, where they were not in issue, was harmless error.

-15-

Although I believe the failure to give an elements instruction was harmless error here, the fact that the trial court failed to follow the statutory procedure for settlement of jury instructions, cannot be ignored. Section 46-16-401(4)(d), MCA, requires a court reporter's presence when instructions are settled; but a court reporter was not present when the instructions were settled.

Instructions were settled late in the evening, but no court reporter was present. It appears that both parties had offered instructions setting forth the elements of the offense, but there is no record of what happened to those offered instructions. And, in attempting to settle a bystander's bill, the trial court could not recall the circumstances relating to these offered instructions. He stated that "at the time these discussions took place the court believes that midnight had passed and everyone was exhausted." The attorneys could not agree on what had happened to the offered instructions. And, of course, because of the failure to follow the statute, there is no record of what happened.

Before the case was argued to the jury the following morning, the parties went on record on the instructions that had been settled the night before, and the instructions did not include an elements instruction. Neither the trial court nor the attorneys noticed that an elements instruction had been omitted.

Had there been a record of the settling of the instructions the night before, the Court would have been able, before reading the instructions to the jury, to determine that for some reason the elements instruction had been omitted. The Court could then have rectified the situation by ordering an elements instruction to be prepared. The failure of the trial court

to follow the statute certainly contributed to the failure to discover the omission of the elements instruction, and the omission of that elements instruction has ultimately led to the reversal of the defendant's conviction. Section 46-16-401(4)(d) was meant to be followed. The trial courts should do so if they want to avoid results such as have occurred here.

_Daniel J. Shea_
Justice