No. 84-415

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

STATE OF MONTANA, ex rel., JERRY
PAUL FORSYTH,

        Petitioner,

   -vs-

DISTRICT COURT OF THE ELEVENTH
JUDICIAL DISTRICT OF THE STATE
OF MONTANA, IN AND FOR THE COUNTY
OF FLATHEAD, THE HONORABLE MICHAEL
H. KEEDY, Judge presiding,

        Respondent.

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

      For Petitioner:

          Robert S. Keller argued, Kalispell, Montana

      For Respondent:

          Hon. Mike Greely, Attorney General, Helena, Montana
          Clay Smith argued, Asst. Atty. General, Helena
          Ted O. Lympus, County Attorney, Kalispell, Montana

               Submitted:  May 2, 1985

                 Decided:  July 2, 1985

Filed: JUL 2 1985

*Ethel M. Harrison*
_____
                 Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

The trial of defendant Jerry Paul Forsyth in the Lake County District Court on a charge of deliberate homicide resulted in a mistrial because of jury deadlock. Defendant filed a petition for writ of supervisory control claiming double jeopardy, denial of speedy trial and error of the District Court in ordering a change in the place of trial. By opinion dated January 3, 1985, this Court declined to take jurisdiction under the petition for writ of supervisory control. Defendant filed a petition for reconsideration, and briefing and oral argument was ordered. We again decline to accept jurisdiction under the petition for supervisory control.

The issues which we will consider in this additional opinion are:

1. Do the Double Jeopardy Clauses of the Montana and United States Constitutions bar retrial of the defendant?

2. Should this Court grant a pretrial review of the speedy trial question?

3. Did the District Court err in ordering a change of place of trial?

The extensive facts of this case are set forth in some detail in our opinion dated January 3, 1985 and will not be restated here, except to the extent necessary to explain our analysis of the legal issues.

I

Do the Double Jeopardy Clauses of the Montana and United States Constitutions bar retrial of the defendant?

Defendant argues that the double jeopardy provisions of the Montana and Federal Constitutions bar retrial. He contends that the misconduct on the part of the bailiff is

2

chargeable to the State in the same manner as misconduct committed by a prosecutor or a judge.

The State argues that jeopardy was not terminated by the declared mistrial following a jury deadlock. The State further argues that there is no standard which bars retrial under the present facts.

It is first necessary to determine whether there has been any double jeopardy following a mistrial as a result of a hung jury. Richardson v. United States (1984), ____ U.S. ____, 104 S.Ct. 3081, carefully analyzed the question of whether double jeopardy had resulted in a fact situation similar to the present Forsyth case. In Richardson, the petitioner argued that the judicial declaration of a mistrial was an event that terminated jeopardy and allowed him to assert a valid claim of double jeopardy. The United States Supreme Court stated:

> "We think that the principles governing our decision in Burks, and the principles governing our decisions in the hung jury cases, are readily reconciled when we recognize that the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy. . . an event which terminated jeopardy in his case and which allowed him to assert a valid claim of double jeopardy.

> "But this proposition is irreconcilable with cases such as Perez and Logan, and we hold on the authority of these cases that the failure of the jury to reach a verdict is not an event which terminates jeopardy. . . Justice Holmes' aphorism that 'a page of history is worth a volume of logic' sensibly applies here, and we reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree."

3

Richardson, 104 S.Ct. at 3086 (emphasis added).

We conclude that in Montana a mistrial following a hung jury, as in the present case, does not terminate the original jeopardy. Defendant argues for an exception to this rule. It is true that Oregon v. Kennedy (1982), 456 U.S. 667, sets forth one exception. The Court held in Oregon v. Kennedy that where governmental conduct giving rise to a motion for mistrial was intended to provoke the defendant into moving for a mistrial, then retrial might properly be prohibited. Defendant argues for an even stricter standard as set forth by the Oregon Supreme Court in State v. Kennedy (Or. 1983), 666 P.2d 1316.

The transcript demonstrates that the comments on the part of the bailiff were not intended to provoke the defendant to move for a mistrial. We do not in any way approve of this type of comment by a bailiff. However, in the present case, the comments could at most be construed as an attempt to assist the State in obtaining a conviction. No conviction was obtained. The jury was unable to agree and a mistrial was granted. Under the specific circumstances of this case, we conclude that the defendant has not come within the Oregon v. Kennedy exception. We also conclude that the bailiff's comments were not so offensive as to require a dismissal, and we decline to adopt a standard similar to that of State v. Kennedy.

In a similar manner with regard to the alleged prosecutorial misconduct, we conclude that the record does not demonstrate an attempt by the prosecution to provoke a mistrial. The conduct was ineffective if the aim was to obtain a conviction.

4

We hold that the Double Jeopardy Clauses of both the Montana and United States Constitution do not bar retrial of the defendant for the following reasons:

1. Because the original jeopardy continued without change following the hung jury and declaration of mistrial, the defendant was not placed in double jeopardy.

2. In addition, the facts do not warrant a conclusion that the defendant presented a colorable double jeopardy claim.

## II

Should this Court grant a pretrial review of the speedy trial question?

Defendant in substance contends that the criminal proceedings should be dismissed because he has been denied a speedy trial. Six hundred thirty days had elapsed since the second trial and hung jury. Defendant makes an extensive argument with regard to the various reasons for this extensive delay, arguing that basically all of the delay is chargeable to the State.

The State argues that the delay is largely due to the defendant's procedural tactics, pointing out that the State has not been independently dilatory. The State makes extensive reference to the order of the District Court of May 23, 1984, pointing out that virtually all of the delay was attributable to the defendant's various motions and supervisory writ proceedings before this Court.

Because we do not conclude that this issue is ripe for review, we will not discuss the facts in detail or attempt to weigh the same.

United States v. McDonald (1978), 435 U.S. 850, contains an extensive discussion of the United States Supreme Court's reasoning in reaching a conclusion that, before trial, a

defendant may not appeal an order denying his motion to dismiss for violation of his Sixth Amendment right to speedy trial. In February 1970, the wife and two daughters of Captain McDonald were murdered in his quarters on a military base. The Army charged McDonald with the murders, but after further investigation, the charges were dismissed and McDonald was honorably discharged. His discharge barred any further military proceedings. After further investigation and almost five years later, a grand jury indicted McDonald on three counts of first degree murder in January 1975.

McDonald sought dismissal of the indictment because he had been denied a speedy trial. The Court concluded that the double jeopardy holding could not be applied to the issue of speedy trial.

> "In sharp distinction to a denial of a motion to dismiss on double jeopardy grounds, a denial of a motion to dismiss on speedy trial grounds does not represent 'a complete, formal and, in the trial court, a final rejection' of the defendant's claim. Abney v. United States, 431 U.S., at 659. The resolution of a speedy trial claim necessitates a careful assessment of the particular facts of the case. As is reflected in the decisions of this Court, most speedy trial claims, therefore, are best considered only after the relevant facts have been developed at trial.

> "In Barker v. Wingo, 407 U.S. 514 (1972), the Court listed four factors that are to be weighed in determining whether an accused has been deprived of his Sixth Amendment right to a speedy trial. They are the length of the delay, the reason for the delay, whether the defendant has asserted his right, and prejudice to the defendant from the delay. Id., at 530. The Court noted that prejudice to the defendant must be considered in the light of the interests the speedy trial right was designed to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant

6

adequately to prepare his case skews the fairness of the entire system.' . . .

"Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative. The denial of a pretrial motion to dismiss an indictment on speedy trial grounds does not indicate that a like motion made after trial--when prejudice can be better gauged--would also be denied. Hence, pretrial denial of a speedy trial claim can never be considered a complete, formal, and final rejection by the trial court of the defendant's contention; . . .

. . .

"Even if the degree of prejudice could be accurately measured before trial, a speedy trial claim nonetheless would not be sufficiently independent of the out come of the trial to warrant pretrial appellate review. The claim would be largely satisfied by an acquittal resulting from the prosecution's failure to carry its burden of proof. The double jeopardy motion in Abney was separable from the issues at trial . . . In contrast, a central interest served by the Speedy Trial Clause is the protection of the factfinding process at trial. The essence of a defendant's Sixth Amendment claim in the usual case is that the passage of time has frustrated his abili ty to establish his innocence of the crime charged. Normally, it is only after trial that that claim may fairly be assessed.

". . . Unlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not, either on its face or according to the decisions of this Court, encompass a 'right not to be tried' which must be upheld prior to trial if it is to be enjoyed at all. It is the delay before trial, not the trial itself, that offends against the constitutional guarantee of a speedy trial. If the factors outlined in Barker v. Wingo, supra, combine to deprive an accused of his right to a speedy trial, that loss, by definition, occurs before trial. Proceeding with the trial does not cause or compound the deprivation already suffered." McDonald, 435 U.S. at 858-61 (emphasis added).

In McDonald, the court pointed out a speedy trial problem which can result from any form of intermediate appeal.

7

> "Many defendants, of course, would be willing to tolerate the delay in a trial that is attendant upon a pretrial appeal in the hope of winning that appeal. The right to a speedy trial, however, 'is generically different from any of the other rights enshrined in the Constitution for the protection of the accused' because 'there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused.' Barker v. Wingo, . . . Among other things, delay may prejudice the prosecution's ability to prove its case . . . and prolong the period during which defendants released on bail may commit other crimes. . .
>
> "Allowing an exception to the rule against pretrial appeals in criminal cases for speedy trial claims would threaten precisely the values manifested in the Speedy Trial Clause. And some assertions of delay-caused prejudice would become self-fulfilling prophecies during the period necessary for appeal." McDonald, 435 U.S. at 862 (emphasis added).

In his diligent representation of the defendant, defendant's counsel has come before this Court a number of times on petitions for supervisory control. We in turn have taken extensive time to consider the petitions, to hear oral arguments and ultimately to give opinions, some of which granted supervisory control and some of which denied it. All of these proceedings, which are in the nature of an intermediate appeal, have become a part of the great delay which raises the speedy trial issue in this case. This underscores the difficult balancing problem this Court has in considering petitions for supervisory control, while seeking to protect the constitutional right of a speedy trial. Unfortunately, these ideas are in substantial part directly conflicting. However, we conclude that we need not reach a decision on the speedy trial question at this time.

We approve and adopt the reasoning quoted above from McDonald. We hold that defendant's claim of a denial of his

right to speedy trial is generically different from his claim of double jeopardy. We conclude that the contentions on the part of the defendant that he has been denied a speedy trial cannot be considered until the retrial is held and all of the facts are presented to this Court on appeal. At that time, the issue will be ready for decision. At the present time, the record is not sufficiently complete to allow a decision on the speedy trial issue.

We hold that the defendant is not entitled to supervisory control on his claim of denial of speedy trial.

III

Did the District Court err in ordering a change of place of trial?

Defendant argues that he has met a considerable burden in initially obtaining a change of venue from Flathead County to Lake County. As appears from our original opinion, the trial court is granted the discretion to determine the place of trial and the procedures to be followed. In advance of trial, we are not able to determine if local prejudice in Flathead County might have some effect on the retrial. We should not presume in advance that the District Court and the State will not use appropriate procedures to protect the integrity of the jury process from any taint which may be present in Flathead County because of local prejudice. However, for the benefit of the District Court and counsel, we emphasize the need for stringent controls to insulate the trial jury from any local prejudice. We insist that appropriate steps be taken to insure a fair third trial.

We conclude that the District Court did not err in ordering the change of place of trial.

9

The petition for supervisory control is denied in all respects.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices


Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent. In view of the fact there have been two trials already I would decide the speedy trial issue at this time. Since the issue is reserved by the majority for later review in the event of conviction, I choose not to express myself on the subject at this time.

_____
Justice

10

Mr. Justice John C. Sheehy, dissenting:

I dissent to the opinion of the majority on rehearing, as I dissented to the original opinion in this case. Because the majority in its decision on rehearing has shifted ground to some extent in its _ratio_ _decidendi_ on the issues presented here, I must again set forth at length my objections to the majority opinion.

The length of this dissent is required in part because of the inadequate discussion of the applicable law in the majority opinion. It is a matter of concern amounting nearly to embarrassment, but not deterrence, to those of us who have differing philosophies of criminal justice and constitutional rights from the majority, that we must resort in dissent to what must appear to the press and the public to be carping over trivialities. Yet these trivialities, as the majority apparently regards them, are of momentous significance to the individuals involved. Here, Forsyth will be subjected to a third trial from which, under our state constitution, he ought to be insulated.

I turn my attention first to the issue of double jeopardy. In its original opinion, the majority refused to grant supervisory control under our state procedure, saying that "the remedy of a criminal defendant lies in an appeal following conviction, or in a post-conviction proceeding." The majority relied on State ex rel. LaFlesch v. District Court (1974), 165 Mont. 302, 306, 529 P.2d 1403, 1405, to reach that conclusion. The decision of this Court in _LaFlesch_ is invalid now under federal law because of a decision in Abney v. United States (1977), 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651.

11

In <u>Abney</u>, the United States Supreme Court determined that a pretrial order in the federal district court denying a motion on double jeopardy grounds was reviewable on appeal under federal appellate practice <u>before</u> the defendant could be put to the burden of a second trial, saying:

> "However, this Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to <u>trial</u> for the same offense." 431 U.S. at 660-1, 97 S.Ct at 2014, 52 L.Ed.2d at 661.

As I said, the majority has now shifted away from its original holding that Forsyth must undergo a second trial and then appeal if he is convicted in order to have the double jeopardy claim reviewed. Instead, in its opinion on rehearing, the majority nimbly jumped to Oregon v. Kennedy (1982), 456 U.S. 667, 102 S.Ct 2083, 72 L.Ed.2d 416 to find that on the jury tampering issue here Forsyth has not brought himself in the exception allowed in Oregon v. Kennedy. Unexplained by the majority is how Oregon v. Kennedy, which applies to <u>prosecutorial</u> malfeasance, applies to jury tampering by a bailiff, a much different situation.

The majority has also shifted its view as to how it will regard the flagrant abuses by the bailiff in this case. In its original opinion here, the majority seemingly agreed with the District Court in concluding that "none of the actions complained of was motivated by a desire or an attempt by the bailiff to influence the jurors' perception of the trial or to affect the jury's deliberations or decision-making, and that none of the bailiff's comments influenced the attitude, perception or ultimate judgment of any juror."

In their opinion on rehearing however, the majority concludes that the comments of the bailiff "could have at

12

most been construed as an attempt to assist the State in obtaining a conviction," as if that were permissible.

The comments that the bailiff made to the jury "to assist the State in obtaining a conviction" were these:

1. Following the testimony of Debbi Neff, a former girlfriend of Forsyth, the bailiff told members of the jury that she must have been drugged to testify, that 'you should see in her medicine cabinet,' implying that she was a drug abuser, and that she had nearly 'blown it' at the first trial.

2. On another occasion during the trial, the bailiff told members of the jury 'I can say just one word and it would remove all doubt from your mind.'

3. While the court and counsel were in chambers during the course of the trial, and the jurors were curious about what was going on in chambers, the bailiff stated that the county attorney, or the county attorney and defense counsel, or the judge and the attorneys would come in after the trial 'and tell you all the things you didn't get to know during the trial and he would answer your questions.' One of the jurors stated that she feared during deliberations that if she voted not guilty and then the county attorney came in and told her about important evidence that had been suppressed, she was concerned that later she would believe she had voted the wrong way.

4. The bailiff informed members of the jury that his son was member of the Kalispell police department which was involved in the prosecution of the action against Forsyth.

5. During the lengthy days' cross-examination of the State's principal witness by defense counsel, the bailiff made the remark on several occasions to members of the jury 'we know who is getting paid by the hour,' imputing deliberate delay to court appointed defense counsel.

6. During the trial, when distributing to the jurors their first expense checks, the bailiff told the jury that the cost of the trial to the State had already reached $6,000.

7. The bailiff pointed out to the jurors the parents of the victim who were seated in the courtroom.

8. When the jurors went to the scene of the crime, they were told by the bailiff to stay together because 'they were afraid that something would happen or some comment would be made that they would get a retrial.'

9. The jurors wanted to send a Christmas gift to one of the witnesses, Norman Calvert, and Bourne, the bailiff, volunteered to ask his son, as a member of the Kalispell Police Department to insure that Calvert received it.

10. The jury began deliberating the case after it was submitted to it on New Year's Eve, December 31, 1982. Bourne told the jury that the Flathead County jury in the earlier case had deliberated for approximately 8 hours and that therefore the jurors in this case might anticipate reaching a conclusion in time for a 'Happy New Year.'

In their original opinion, the majority found "substantial evidence to support the District Court's findings" that the bailiff's remarks had no effect on the trial jury. Now, the majority sees those comments as an inconsequential attempt "to assist in obtaining a conviction."

I would hold that the remarks of the bailiff to the jurors prejudiced the jury as a matter of law to prevent Forsyth from getting a fair second trial; that the bailiff's statements are not covered by the decision of the United States Supreme Court in Oregon v. Kennedy, supra; and that under our state constitution the criminal proceedings against Forsyth in this case should now be dismissed on double jeopardy grounds.

No discussion appears in the majority opinion as to whether it is determining the case on federal or state grounds. Because, however, it relies on Oregon v. Kennedy in reaching its decision, I must assume that it regarded the case solely from the viewpoint of the federal constitution without any regard to our state constitution.

The following state constitutional provisions apply to Forsyth in this case:

"Right and justice shall be administered without sale, denial, or delay." Art. II, Sec. 16.

14

"No person shall be deprived of life, liberty, or property without due process of law." Art. II, Sec. 17.

"In all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face; . . . to have . . . a speedy public trial by an impartial jury . . ." Art. II, Sec. 24.

". . . No person shall be again put in jeopardy for the same offense previously tried in any jurisdiction." Art. II, Sec. 25.

"The right of trial by jury is secured to all and shall remain inviolate . . ." Art. II, Sec. 26.

Everyone of those state constitutional rights have been taken from Forsyth by the State either through its jury tampering by the bailiff or by its denial of a speedy trial.

I have set out the state constitutional provisions above because I feel that our state constitution controls this case and because the majority opinion has not made any reference to the state constitution. The majority members apparently feel that double jeopardy rights under our state constitution are co-terminous with such rights under the federal constitution. This is evinced because the majority has tried to fit the decision in this case into the United States Supreme Court decision in Oregon v. Kennedy, supra. As I hope to demonstrate, that case is not applicable here.

There is no United States Supreme Court decision directly determining the effect on a defendant's right to fair trial when a bailiff has tampered with the jury in the defendant's disfavor. We have no federal criteria that would guide us as to how the present United States Supreme Court would view double jeopardy under the facts of this case from the federal viewpoint. I sense that the United States Supreme Court is considerably less concerned about the constitutional rights of defendants than I am. I, therefore,

confine myself in this dissent to an examination of this case from the viewpoint of our state constitution and statutes. If I advert in this opinion to federal decisions, it is only for the purpose of attempting to explain them, or to use the rationale of the federal decisions to buttress my opinion of the application of our state's constitution.

There are Montana statutes that directly instruct a bailiff as to his duties when the jury is placed in his charge. When a jury is to view the premises, under § 46-16-502, MCA, the jurors are conducted in a body under the custody of the sheriff or bailiff to view said place. The bailiff may not then communicate with them concerning any subject, for the statute provides:

> "46-16-502. View of relevant place or property. When the court deems it proper that the jury view any place or personal property pertinent to the case, it will order the jury to be conducted in a body under the custody of the sheriff or bailiff to view said place or personal property in the presence of the defendant and his counsel. The place or personal property will be shown them by a person appointed by the court for that purpose, and they may personally inspect the same. The sheriff or bailiff must be sworn to suffer no person to speak or otherwise communicate with the jury or to do so himself on any subject connected with the trial and to return them into the courtroom without unnecessary delay or at a specified time, as the court may direct." (Emphasis added.)

The bailiff here violated that statute when he informed the jury that they must stay together because otherwise the defendant might get a retrial.

When the bailiff is in charge of the jury, the duty of the bailiff is statutorily clear:

> "46-16-501. Conduct of jury during trial. (1) The jurors sworn to try an action may at any time before the submission of the case, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer. The officer must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to them or communicate with them or

to do so himself on any subject connected with the trial, and to return them into court at the next meeting thereof.

"(2) (a) The jury must also at each adjournment of the court, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial or to form or express any opinion thereon until the cause is finally submitted to them.

"(b) In all cases appealed to the supreme court, it shall be conclusively deemed that the court or judge gave the proper admonition in accordance with the provision of subsection (2)(a) unless the record affirmatively shows to the contrary."

Under Montana practice, each time that the jury is delivered to the charge of the bailiff, the bailiff takes an oath before the court, an oath that is couched in the language of the foregoing statutes, that he will obey those statutes when the jury is in his charge.

Without quaver, we can assert that the bailiff Bourne flagrantly violated his oath and the statutes in this case.

It is time now to examine Oregon v. Kennedy, the United States Supreme Court case upon which the majority members base their decision on double jeopardy in this case.

The U.S. Supreme Court decision in Kennedy can be summarized: when a defendant in a criminal case successfully moves for a mistrial, he may invoke the bar of double jeopardy in a second effort to try him only if the conduct giving rise to the successful motion for a new trial was prosecutorial or judicial misconduct intended to provoke the defendant into moving for a mistrial.

Just for starters, we may note the distinguishing characteristics of this case from Oregon v. Kennedy. Here, the mistrial was the result of a hung jury, not one where the defendant moved for mistrial; secondly Oregon v. Kennedy

17

discusses prosecutorial or judicial misconduct; here we have a case of bailiff misconduct.

In Oregon state court, Kennedy was tried for stealing an oriental rug. During the cross-examination of an expert on the value of the rug, the prosecutor asked the expert whether he had done business with the Kennedys. The expert answered that he had not. The prosecutor asked: "Is that because he is a crook?"

The trial judge granted defendant's motion for a mistrial on the ground of prosecutorial misconduct.

The double jeopardy hearing in the trial court in Kennedy was to a judge different from the one who had granted the mistrial. The trial judge determined that while the prosecutorial questioning was "overreaching," he did not find that the prosecutor intended to provoke the defendant into moving for a mistrial. Therefore, the trial judge denied the double jeopardy motion. The denial was appealed to the Oregon Court of Appeals.

In State v. Kennedy (Oregon 1980), 619 P.2d 948, rev. den. 290 Or. 551 (1981), the Oregon Court of Appeals held that double jeopardy applied under the United States Constitution and that the defendant could not be retried. The Court of Appeals based its decision on the proposition that the prosecutor was indeed "overreaching." The Oregon Supreme Court, without comment, denied the state's petition for a review of the decision of the Court of Appeals.

The case came before the United States Supreme Court on certiorari and was decided in Oregon v. Kennedy, supra. The U.S. Supreme Court decided that the Oregon Court of Appeals had acted on federal constitutional grounds and therefore the matter was properly reviewable in the Washington D.C. Court.

18

It then reached a decision which I have summarized above, remanding the cause to the Oregon Court of Appeals to determine if in fact the prosecutor had "intended" to provoke the defendant into moving for a mistrial.

The Kennedy case returned to the Oregon Court of Appeals, reported in State v. Kennedy (Oregon 1983), 657 P.2d 717. Because the trial court had found that the prosecutor's question was not intentional, the Court of Appeals then reversed itself saying that double jeopardy was not a bar. The Court of Appeals assumed that the Oregon law concerning retrials after prosecutor-induced mistrials was identical and co-terminous with the view of the federal jeopardy clause expressed by the U.S. Supreme Court in Oregon v. Kennedy.

The matter came again before the Oregon Supreme Court in State v. Kennedy (Oregon 1983), 666 P.2d 1316. The Oregon Supreme Court decided that its law was not identical with the federal view of the double jeopardy clause in the facts pertaining to the prosecutorial misfeasance case, mainly because the Oregon Supreme Court recognized as difficult obstacles, proving "intent" on the part of the prosecutor, and the difficulty faced by trial courts in making decisions which could lead to the disbarment or other punishment of the prosecutors. The Oregon Supreme Court concluded that it would hold under its constitution and state law that double jeopardy applied if the prosecutorial conduct was so prejudicial to the defendant that it could not be cured by any means short of a mistrial, and if the official knew the conduct was improper and prejudicial and either intended or was indifferent to the resulting mistrial or reversal. The Oregon Supreme Court then went on to find that in the Kennedy case, it could not say that the official intended to provoke

19

a mistrial, or that the prosecutor was indifferent to the result of his questioning and affirmed the Court of Appeals.

It should be apparent that Oregon v. Kennedy, in any of its phases, has no connection with bailiff tampering of a jury to aid the state, a completely different question.

Not discussed by the majority is another Oregon case which is directly in point. That case is Oregon v. Rathbun (Oregon 1979), 600 P.2d 392. The facts are so nearly parallel to the facts of the Forsyth case that they bear some recitation here.

Rathbun was charged with first degree robbery and the case was submitted to a jury which deliberated for a day and a half and then reported to the trial judge that it was at an impasse. Defendant's motion for a mistrial was allowed. On the evening of the order granting mistrial, two of the jurors went to the district attorney and advised him about comments which had been made by the court's bailiff to the jury during the recesses in the trial and during the deliberations. Six days later, in the presence of counsel the jurors were individually interrogated by another judge concerning the bailiff's conduct and its effect on the jurors.

The case reached the Oregon Supreme Court after the Court of Appeals reversed the District Court which had held that double jeopardy applied.

The Oregon Supreme Court first considered whether there was a causal relationship between the improper remarks of the bailiff and the inability of the jury to agree upon a verdict. During the interrogation, each and every juror had denied being influenced by the bailiff's remarks. The Oregon Supreme Court determined that no court could attempt by some method of mind reading to know whether the bailiff's conduct

20

actually influenced the mental process of any of the jurors and held with respect to that situation it would assume, without proof, that there was a causal relationship between the misconduct and the mistrial. The Oregon Supreme Court determined that those cases applying to prosecutorial and judicial misconduct had no application here:

> "We agree with the Court of Appeals that this is not a case in which the mistrial was 'triggered by prosecutorial or judicial desire to harass the defendant or afford the prosecution a more favorable opportunity to convict.' (Citing a case.) We further agree that this is a case of an officer of the court who, on her own, was guilty of improper conduct which caused the mistrial in question. We cannot agree that the want of prosecutorial and judicial misconduct leaves the case in the same situation in which jury contamination resulting from ordinary third party misconduct causes a mistrial and is, therefore, no bar to retrial." 600 P.2d at 397.

The Oregon Supreme Court then held, under Oregon law (which is substantially similar to our state law):

> "In the United States Supreme Court decisions cited by the parties concerning prosecutorial or judicial misconduct the misconduct was perpetrated for the very purpose of triggering a motion by the defendant for a mistrial. Here there is nothing to suggest the bailiff sought to cause a mistrial. We daresay that nothing was further from her mind than causing a hung jury by her prejudicial discourse. On the contrary, her apparent purpose, as appears from the motion judge's findings, was to assist the state in securing a conviction.

> "The misconduct by this bailiff is so abhorrent to the sense of justice that we find the same sanction is required to effectuate the constitutional command as in the case where the prosecutor or the judge intends to provoke a mistrial. The state put this officer of the court in the position to wreak havoc and must bear the same burden as when its prosecutor or judge in like manner offends." 600 P.2d at 398. (Emphasis supplied.)

The Oregon Supreme Court found it abhorrent to its sense of justice that a bailiff would attempt "to assist the state in securing a conviction." The majority members of the Montana Supreme Court find such assistance permissible.

21

I would agree with the Oregon Supreme Court in Oregon v. Rathbun, and hold that in this case double jeopardy applied to prevent any further prosecution of Forsyth because of the bailiff's misconduct.

Forsyth also charges in this case that he is entitled to double jeopardy on the grounds of prosecutorial misfeasance. The majority members have dismissed that charge without any discussion of either state law or the exception carved out in the United States Supreme Court under Oregon v. Kennedy, supra. I will not belabor the point, since I have already determined, for my purposes that double jeopardy ought to apply because of the bailiff's misconduct.

Turning now to the speedy trial issue, I disagree with the majority holding that a defendant must wait until after trial before he can have an appellate review of a speedy trial issue. Such a holding means that in all cases, no matter how long the trial has been delayed, the defendant has no recourse to an adverse decision on his right to speedy trial in the district court until the trial which has been denied him speedily has occurred.

In this case, two and half years have now elapsed since the second trial of Forsyth. Much, if not all of the delay is attributable to the State both because it has resolutely refused to provide him with the tools of his defense, and resolutely determined to try him again in Flathead County, a site where it has already been determined that he could not receive a fair trial.

Again, the reliance of the majority members on the federal decision of United States v. MacDonald (1978), 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18, relating to speedy trial is misplaced. The MacDonald case is careful to

22

distinguish a speedy trial issue from a double jeopardy issue. It made that distinction because under Abney v. United States, supra, a denial of a double jeopardy claim is a full and final resolution of that issue separate and apart from a trial and under federal practice there is a right of review of such a denial. There is no right of review of a denial by a federal district court of a speedy trial claim because the speedy trial issue is "not sufficiently independent of the outcome of the trial to warrant pretrial appellate review." In other words, under federal practice, there is no provision for an appeal from a federal district court to a higher Court of Appeals of a speedy trial issue, before the trial actually occurs.

That is not the case under our law. Our constitutional provision for supervisory control allows this Court to intervene in interlocutory manner in cases pending in the district courts when the district court, though acting in jurisdiction, is nevertheless committing error.

If the interest of this Court cannot be aroused when faced with a 2½ year delay in trial, especially when most of the reasons for the delay exist in the records of our Court, there is little hope that such interest will be aroused after the next trial, if Forsyth is convicted.

Finally, with respect to the issue of change of venue, the majority decides that issue without any reference to § 46-13-203, MCA, the statute controlling the power of the courts to change the place of trial.

That section provides in pertinent part:

"If the court determines that there exists in the county in which the prosecution is pending such prejudice that a fair trial cannot be had, it shall:

23

"(a) transfer the cause to any other court of competent jurisdiction in any county in which a fair trial may be had;

"(b) direct that a jury be selected in any county where a fair trial may be had and then returned to the county where the prosecution is pending to try the case; or

"(c) take any other action designed to insure that a fair trial may be had." (Emphasis supplied.)

Section 46-13-203, MCA, defines the power of the district court to change the place of trial in a criminal case. In this case, the prosecution of Forsyth was pending in Lake County. The District Court has never determined that there existed in Lake County such prejudice that a fair trial could not be had there. Therefore, the district court had no power to move the venue of the trial from Lake County. The reason that the majority members do not discuss § 46-13-203 is understandable. Under the statute, it cannot be explained where the District Court got the authority to change the place of trial here.

Forsyth may well be guilty of killing his wife, or plotting to kill her. The headstrong determination of the bailiffs, the District Court, the prosecution and this Court to convict him at whatever cost to constitutional rights, to statutory directions, or to commonly accepted notions of fair trial make his further prosecution unacceptable to me. I would order his prosecution dismissed.

_____
John C. Sheehy
                Justice

Mr. Justice William E. Hunt, Sr., concurs with the foregoing dissent.

_____
William E. Hunt
                Justice

24