MR. JUSTICE SHEEHY,
dissenting:
SPEEDY TRIAL
I protest the way the majority has papered over the facts relating to the issue of speedy trial. The long and intolerable delay in bringing this defendant to a third trial is the direct result of the improper tactics of the prosecution, the intransigence of the District Court and the unwillingness of this Court, when requested, to face the issues and make a decision. Those factors which served to delay the third trial cannot all be laid at the feet of the defendant.
Forsyth was originally charged in the District Court of Flathead County, with deliberate homicide on January 28, 1980. His first trial was held in that county during March and April, 1980 and resulted in his conviction. We reversed in State v. Forsyth (1982), 197 Mont. 248, 642 P.2d 1035.
The District Court then determined that a fair trial could not be had in Flathead County and so the place of trial was changed to Lake County. Forsyth underwent a second trial commencing December 1, 1982, where a mistrial was ordered on January 2, 1983, because of a hung jury.
Up through the second trial, Forsyth had been represented by private counsel retained by him. The two trials apparently depleted his *424 assets, and as an indigent person, he applied to the District Court for the appointment of his formerly retained counsel to represent him at county expense. The District Court refused, and proposed instead to require that Forsyth be represented by the Flathead County public defender. At some point in these proceedings, the two counsel, who had formerly been retained by Forsyth to defend him, offered to continue representing him in his defense and to charge the county for their services at the rate paid by the county to its public defenders and to charge but for one attorney. Nonetheless, the District Court persisted in looking first to the public defenders and when conflict there showed, to another firm of attorneys who were completely without knowledge of the facts and defenses supplied to Forsyth’s case. Even these counsel protested they had conflicts of interest and could not represent Forsyth.
The question of Forsyth’s defense counsel required two petitions to this Court. His first petition here was denied on May 11, 1983, where we held that there was no showing sufficient to warrant supervisory control. When the District Court persisted in appointing defense counsel other than his retained counsel, Forsyth again petitioned this Court for a writ of supervisory control and on October 6, 1983, on the order of this Court, the writ was granted and Forsyth’s present counsel were appointed at public expense.
Thus, the two petitions in this Court relating to the appointment of his counsel for a third trial were necessitated by the inexplicable refusal of the District Court judge to appoint, at the same expense to the county as a public defender, those attorneys most directly conversant with the case and who had obtained for Forsyth a reversal of his first conviction, and a hung jury on the second trial.
The appointment of counsel was not the only problem faced by Forsyth before the District Court. Forsyth made a demand, as was his right, for a transcript at public expense of the testimony and proceedings in the second trial. Section 3-5-604, MCA, provides that in a criminal case where the defendant is unable to pay for a transcript, it shall be furnished to him and paid for by the state. The District Court first limited the transcript which he would permit to that of defendant’s testimony and the State’s witnesses. Although Forsyth made several motions for a full transcript, and included this problem as part of the writs which he was pursuing before this Court it was not until January 13, 1984, that the District Court ordered that he be supplied with the remainder of the transcript. Perhaps the majority can explain how defense counsel could properly *425 prepare for the third trial without having available to them the full transcript of the second trial.
Again, the majority attribute this delay completely to the defendant.
I urge and insist that these two items of delay, brought about by the District Court itself, cannot be characterized as institutional delay to be weighed less heavily, or otherwise attributable to the defendant; for if the defendant must bear the brunt in a speedy trial computation in choosing between pursuing his legal rights to a fair defense or proceeding with ineffective counsel, improperly prepared, he is given no choice at all.
A third item which caused delay was the immoderate order of the District Court to change the place of trial from Lake County to Flathead County. The poisoned atmosphere that pervaded Flathead County was the reason that the trial had been changed to Lake County originally. True, a jury was imported from Toole County to Flathead County for the third trial. The task of the jury in Flathead County was like having a band of Gauls to choose who should win between the Christians and the lions before the packed Roman citizenry in the coliseum in the days of the Caesars.
The change of place of trial, the refusal of the District Court to dismiss on his jury tampering charge, and the denial of the District Court of his motion for dismissal for lack of speedy trial caused Forsyth to come to this Court again seeking a writ of supervisory control. His application was filed here on September 24, 1984, 631 days after the mistrial caused by a hung jury in Lake County. A final decision on his application for writ did not come out of this Court until July 2, 1985. The further delay of 281 days can mostly be attributed to a mistake of law made by this Court. In its first opinion, issued January 3, 1985 [State ex rel. Forsyth v. District Court, 216 Mont. 480,] (701 P.2d 1346), the majority held that the refusal of a district court to dismiss criminal charges on a double jeopardy claim did not warrant supervisory control, and that the remedy on a double jeopardy claim for a criminal defendant lay only in an appeal following his conviction or in a post-conviction proceeding. In other words, the majority held that even though he would be subjected to double jeopardy he must nevertheless go to trial a second time. When the majority was made aware of the holding of the United States Supreme Court in Abney v. United States (1977), 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651, it was forced to grant a rehear *426 ing. Thus, a final decision did not come on Forsyth’s application until July 2, 1985. The writ was again refused.
In good conscience this Court cannot count against Forsyth a delay caused by the majority’s mistake of law.
It is galling to read in the majority opinion that the trial delay was “mitigated by the presence of transcripts from the previous trials.” In this case, the mistrial on the second trial occurred on January 2, 1983. The last volume of the transcript of the second trial was delivered to Forsyth on April 23, 1984, a delay itself of 476 days, most of it unnecessary. It was said in United States v. MacDonald (1978), 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18, that in applying Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, the possibility that the defense will be impaired is the most serious consideration, “because the inability of the defendant adequately to prepare this case skews the fairness of the entire system.” Wingo, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.
JURY TAMPERING
The majority opinion does not discuss the jury tampering issue, but it was a large factor in the efforts made by Forsyth between the second and third trials to obtain a dismissal on the ground of double jeopardy.
Without question, the court’s bailiff during the second trial in Lake County made ten documented egregious comments to members of the jury adverse to Forsyth’s case. The instances are outlined in my dissent found in 701 P.2d at 1359. Despite the baleful remarks of the bailiff, the majority denied Forsyth’s double jeopardy claims because the remarks were not an act of the prosecution, because no conviction was obtained, and, incredibly because “in the present case, the comments could at most be construed as an attempt to assist the state in obtaining a conviction.” [216 Mont. at 496,] 701 P.2d at 1356.
True, a conviction was not obtained; neither was an acquittal. Who is to say if left the jury untampered, an acquittal might not have been obtained?
I iterate this point to insist that a proper construction of the law in cases of jury tampering by a bailiff is not to be tested by the test applied to prosecutors, whether the bailiff was attempting to provoke a mistrial. We cannot know the bailiff’s intent in this case. We can only know that his remarks to the jury were inexcusable, in violation of the bailiff’s oath of office, were abhorrent to our sense of *427 justice, and cannot be excused on the ground that the bailiff is only attempting “to assist the state in securing a conviction.” Oregon v. Rathbun (1979), 287 Ore. 421, 600 P.2d 392.
CHANGE OF PLACE OF TRIAL
Because it may go unreported in the written opinions that have evolved from this case, some mention should be made of the jury climate in which the third trial in Flathead County occurred.
The homicide of Karen Forsyth on December 11, 1979 became the subject of intense public discussion in Flathead County. Spurred by pervasive and abrasive newspaper and radio coverage, public sentiment was brought to a white heat in that county. After the first trial, and the reversal of the conviction by this Court, the defendant moved in the District Court for a change of place of trial from Flathead County. A survey of public opinion, and press clippings from the date of the homicide until the defendant was sentenced in May, 1980, convinced the then presiding district judge to make findings of fact and a conclusion requiring the cause to be transferred to Lake County before the second trial, because a fair trial could not be had in Flathead County.
After the Lake County jury hung up in the second trial and a mistrial was ordered, the State moved the District Court for a change of place of trial from Lake County back to Flathead County, requesting that the cause be tried in Flathead County, either before a Flathead County jury or one selected from another county and returned to Flathead County for trial. The court in effect granted that motion. Thus, the third trial was returned to Flathead County, the same county, in which it had been earlier judicially determined that defendant could not receive a fair trial.
The trial judge commented to the Toole County jury on the first day of the third trial:
“I would note as you have seen already that there is considerable public interest in these proceedings and you can tell that if by no other reason than the presence of the news media representatives, including a television camera, among other things. I want to say at the outset, that even though this controversy has generated a great deal of community interest in Flathead County, and even though as a result of this trial, to a certain extent this Court will probably be under the microscope of public scrutiny as well as the parties and their counsel . . .”
The court went on to give the jury the usual cautionary instruc *428 tions that they were not to be influenced by matters outside the testimony of the trial and the exhibits received. However cautioned, the jury members could not fail to perceive and perhaps to respond to the unremitting pressure for a conviction of the defendant.
Bands of women, sensing somehow that the case involved women’s rights, made it their business to pack the courtroom, every one of the 41 court days of the third trial. Sandy Richards, testifying that Douglas Richards had admitted to her that he committed the homicide of Karen Forsyth and not the defendant, complained on the record of the laughter coming from the members of the audience during her testimony, from two different sections of the courtroom audience. Interruptions from the audience in the court proceedings during trial are reflected in the court transcript. Everyday, before the jury verdict was announced, prejudicial radio coverage of the trial proceedings was going out over the airwaves.
After the third trial, Forsyth filed a motion for a new trial and to supplement the record with respect to the prejudicial trial publicity adverse to the defendant. Defendant claimed that radio broadcasts to which the juror members were exposed contained biased, false and prejudicial statements. One of the jurors had written a post-trial article in the “Shelby Promoter,” a newspaper published in Toole County, which article contained several of the radio statements. The defendant caused to be issued and served a subpoena duces tecum upon the owner of the offending radio station. On the day of the hearing, the owner did not deign to appear, but sent one of his employees who sought to excuse not bringing the copies of broadcasts on the grounds the broadcast of all the news all over the world was too voluminous to bring to court. On the day of the hearing, the trial court ordered that the radio station provide at least one copy of the longest broadcast for each of the court days. Before adjourning the hearing, the District Court stated that the broadcast material would be placed in the record prior to the court’s ruling on the motion for a new trial and the defense would be permitted to make its argument. That evening, copies of broadcasts of 27 of the 41 days were furnished to the trial judge. No further copies of the broadcast were supplied and no further hearing was set. Five days later, the District Court denied the motion for new trial without further argument or hearing.
Thus, the District Court gave the defendant no opportunity to complete the record with respect to the effect of the radio broad *429 casts on the jurors and now the majority condemns the defendant for failing to show such influence.
Even if we were not to consider the effect of the radio broadcasts, the transcript itself contains enough reference to the packed courtroom antics to assure us that the first district judge was correct in the first place in determining that in Flathead County the defendant could not receive a fair trial.
The majority now state that the District Court acted properly in changing the place of trial back to Flathead County because the District Court is empowered under Section 46-13-203(3)(c), MCA, to “take any other action to ensure that a fair trial may be had.” Flathead County was the least possible of the 56 counties in Montana in which Forsyth could have received a fair trial. Not lost to the taxpayers of Flathead County, especially reminded by the press and radio, was the mounting cost to them of the prosecution and defense of Forsyth.
ADDITION OF NEW WITNESSES
In mid-course of the State’s case-in-chief in the third trial, the state moved to amend the information to add new witnesses not therefore disclosed to the defendant Forsyth.
The court permitted the amendment of the information and the subsequent testimony. Thus, Charlie Perkins and Timothy Hiser, prisoners in the Montana State Prison, were permitted to testify that Forsyth had made a jailhouse confession that he killed Karen while Forsyth was incarcerated after the first trial.
During the second trial of Forsyth, in Lake County, the jury had been permitted to know that Forsyth had been convicted of a homicide in the first trial in Flathead County. In preparation for a third trial, Forsyth and the District Court seemed in agreement that any knowledge of Forsyth’s first conviction should be kept from the Toole County jury. Thus, voir dire of prospective jurors from Toole County was conducted without reference to the first conviction, nor any impression the jurors might have regarding a first conviction.
When the State proposed to amend the information to add the name of Charlie Perkins, Forsyth objected strenuously, pointing out Perkins’ untrustworthiness, substantiated by some of the prison staff, and particularly objecting that his testimony would reveal to the jury the first conviction about which Forsyth had not an opportunity to voir dire the prospective jurors. The majority hold that the “denial of this opportunity is not so material that it gives rise to a *430 claim for a new trial.” But see, State v. Doll (Mont. 1985), [214 Mont. 390,] 692 P.2d 473, 42 St.Rep. 40.
In like manner, Timothy Hiser was also permitted to testify to a jailhouse confession.
With the amendment of the names of Perkins and Hiser, the issues in the District Court trial took off in all directions. Hearings were necessary to bring in prison officials and others respecting the characters of Perkins and Hiser. A search was made of the possibility of finding witnesses among the 135 prison inmates who might disprove the jailhouse confession (an impossible task). When permitted to testify, the prison inmates not only testified to the jailhouse confession, but claimed Forsyth committed other crimes, including wielding a shank while he was in prison (Perkins had in fact been disciplined in prison for carrying a shank, which is a knife-like object). Hiser testified that the defendant had made threats to kill the prosecutor, and that his counsel had threatened to reveal to other prisoners that he was an informer. This evidence of other crimes were not noticed pretrial to defendant (State v. Just (1979), 184 Mont. 262, 602 P.2d 957). Defendant’s counsel, however, did not object to the evidence of other crimes.
Post-trial, Forsyth moved for new trial, including as grounds that Perkins and Hiser had been promised benefits for their testimony. The pretrial hearings had brought out evidence from the prison officials that Perkins under long-term sentences, had wanted to be transferred out of the Montana State Prison; that two states, Washington and Idaho, had refused his transfer; and that as far as the prison staff was concerned, they would make no other effort to get him transferred. Following the trial of Forsyth, Perkins was transferred to the Wyoming Prison; he never returned to the Montana State Prison following the trial.
Forsyth further learned post-trial that correspondence existed between Timothy Hiser and the district judge before the third trial in which Hiser complained of the conditions of the Montana State Prison. Although Hiser testified that he was promised nothing for his testimony, following the third Forsyth trial, he was kept in the Flathead County jail until the spring of 1986, when he was completely released from all incarceration though he had been given a five year sentence in 1985. Hiser also never returned to Montana State Prison. The District Court denied the motion for new trial on this ground without giving Forsyth an opportunity to develop fur *431 ther hearings as to what agreements, if any, existed between the State and the prisoners when their testimony was arranged.
The majority approves the District Court’s denial of a new trial on this point by stating that the additional evidence would be merely cumulative impeaching evidence as to the prison witnesses. That ground understates the impact on the trial of the introduction of this kind of testimony, the distraction of the jurors of having to choose between the testimony of the accused defendant and the uncorroborated testimony of prison inmates who probably stood to benefit from their testimony, and the grinding-down effect of a prolonged trial that ensued from the amendment allowing these witnesses. Defendant’s constitutional right to a fair trial is directly involved in this issue.
CUMULATIVE ERROR
I do not wish to belabor this dissent by additional comments upon the testimony of the mother of the homicide victim that Forsyth had urinated on the victim; the murder charge filed against Gary Red Elk; the change of testimony of Dr. Johnson; the withholding of the names of witnesses and exculpatory evidence by the State; and, a variety of other errors and improprieties which made a farce out of the fair trial requirement in this case.
To sustain the conviction, the majority has had to resort to a litany of intonements about “burdens” on the defendant, that claimed errors are “arguable” and that no “prejudice” has resulted to the defendant Forsyth.
I am unable to be convinced that the errors and improprieties singly or in concert, did not contribute to Forsyth’s conviction in the third trial beyond a reasonable doubt. Accordingly, as to those errors and improprieties, I would reverse and grant a new trial. However, because of the bailiffs baleful attempts to assist the prosecution to convict Forsyth in the second trial, I would find that the third trial constituted double jeopardy and order a reversal and dismissal of the case.
MR. JUSTICE HUNT concurs in the foregoing dissent of MR. JUSTICE SHEEHY.